IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARVIN MENJIVAR GUTIERREZ | ) | 1:21-cr-260 (LMB) |
| (a/k/a "Astuto"), | ) | |
| CRISTIAN AREVALO ARIAS | ) | |
| (a/k/a "Serio"), and | ) | |
| CARLOS TURCIOS VILLATORO | ) | |
| (a/k/a "Oculto"), | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

On February 2, 2024, after a seven-day trial and three days of deliberations, a jury found defendants Marvin Menjivar Gutierrez ("Menjivar" or "Astuto"), Cristian Arevalo Arias ("Arevalo" or "Serio"), and Carlos Turcios Villatoro ("Turcios" or "Oculto") guilty of criminal offenses stemming from their participation in the racketeering activities of "La Mara Salvatrucha," more commonly known as MS-13.[1] Before the Court are: Menjivar's Motion for Judgment of Acquittal, or in the alternative, for a New Trial, [Dkt. No. 922]; Arevalo's Motion for Acquittal, [Dkt. No. 923], and Motion for a New Trial, [Dkt. No. 924]; and Turcios's Motion for a New Trial and for Judgment of Acquittal, [Dkt. No. 925]. Oral argument on defendants' motions has been held, and for the reasons that follow, the motions will be denied.

I. STANDARD OF REVIEW

Pursuant to Federal Rule of Criminal Procedure 29(a), "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a

---

[1] The Court has included each of the defendant's "takas," or nicknames, that were used to identify them within MS-13 and were referenced substantially at trial.

judgment of acquittal of any offense for which the evidence is insufficient to sustain a

conviction." In conducting such a review of the evidence, a court is obligated to sustain a

conviction if, viewing the evidence in the light most favorable to the prosecution, the verdict is

supported by "substantial evidence." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996)

(en banc) (citing Glasser v. United States, 315 U.S. 60, 80 (1942)). "Substantial evidence" is

defined as "evidence that a reasonable finder of fact could accept as adequate and sufficient to

support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Smith,

451 F.3d 209, 216 (4th Cir. 2006) (citation omitted). A Rule 29 determination focuses on both

the elements of the offense charged and on the factual sufficiency of the evidence.

Federal Rule of Criminal Procedure 33 permits a court to vacate a conviction "and grant a

new trial if the interest of justice so requires," United States v. Ali, 991 F.3d 561, 570 (4th Cir.

2021) (quoting Fed. R. Crim. P. 33(a)); however, this is a highly disfavored remedy that a court

should grant only "sparingly," United States v. Palin, 874 F.3d 418, 423 (4th Cir. 2017) (quoting

United States v. Arrington, 757 F.2d 1484, 1486 (4th Cir. 1985)). A jury verdict is not to be

overturned except in the rare circumstance when the evidence "weighs heavily" against it.

Smith, 451 F.3d at 217 (citing United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003)).

## II. ANALYSIS[2]

### A. Menjivar's Post-trial Motion

The jury found defendant Menjivar, also known as Astuto, guilty of conspiracy to

participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count I); conspiracy

---

[2] Each of the defendants has filed a post-trial motion requesting a Rule 29 judgment of acquittal, or in the alternative, a new trial under Rule 33. Because the defendants primarily raise different arguments, the merits of each defendant's post-trial motions will be evaluated separately, with the exception of two overlapping issues applicable to all defendants, which will be addressed in Section II.D, infra.

to distribute cocaine, in violation of 21 U.S.C. §§ 841(a), 846 (Count II); conspiracy to commit

the murder of Milton Beltran Lopez ("Beltran Lopez") in aid of racketeering, in violation of 18

U.S.C. § 1959(a)(5) (Count III); the murder of Beltran Lopez in aid of racketeering, in violation

of 18 U.S.C. § 1959(a)(1) (Count IV); and use of a firearm during a crime of violence causing

death, in violation of 18 U.S.C. § 924(j) (Count V). See [Dkt. No. 899]. In his post-trial motion,

Menjivar asks the Court to enter a judgment of acquittal on Counts III, IV, and V, or in the

alternative, grant a new trial on those counts, along with a new trial on Counts I and II. See [Dkt.

No. 922].

    As to Counts III, IV, and V, Menjivar first argues that he did not "aid, abet, counsel,

command, induce or produce" the murder of Beltran Lopez, because the evidence at trial showed

that it was co-defendant Melvin Canales Saldana ("Canales" or "Demente") who communicated

directly with high-level MS-13 leadership in El Salvador to "pressure clique members into

committing acts of violence," including the murder of Beltran Lopez. [Dkt. No. 922] at 6-7

(characterizing the evidence as establishing that as early as May 30, 2019, Canales, not Menjivar,

authorized Mario Guevara Rivera to murder rival gang members at his discretion). As a result,

Menjivar argues that the Government failed to introduce sufficient evidence demonstrating that

he "participated in the murder" of Beltran Lopez, by "help[ing]" Mario Guevara Rivera

("Guevara Rivera") and others "to complete" its commission. [Dkt. No. 922] at 8.

    To convict Menjivar under an aiding and abetting theory of liability, the jury was

required to find that he: 1) took an affirmative act in furtherance of the underlying offense, and

2) did so with the intent of facilitating the offense's commission. See United States v. Odum, 65

F.4th 714, 721 (4th Cir. 2023) (citing Rosemond v. United States, 572 U.S. 65, 71 (2014)); 18

U.S.C. § 2. As the Government correctly argues in its opposition, to convict Menjivar of aiding

and abetting the murder of Beltran Lopez, the Government was not required to prove that Menjivar participated "in every stage of [the] illegal venture;" rather, its burden was to show that Menjivar "participat[ed] at some stage accompanied by knowledge of the result and intent to bring about that result." See United States v. Arrington, 719 F.2d 701, 705 (4th Cir. 1983) (cleaned up). At trial, the evidence plainly established that Menjivar had decision-making authority over the STLS clique as its leader and that he communicated to lower-level gang members his desire for those members to kill rival gang members so as to increase their rank within MS-13 and enable the clique to occupy more territory in Virginia. See, e.g., Gov't Ex. 23-78A; 23-78C2 ("Each one of the chequeos has two months to prepare a well-explained and detailed report regarding who to play with and how to proceed. Once it's done, it needs to be sent to A1 by December 1, 2019; he will decide if play will be allowed or not.").[3] The jury was presented with sufficient evidence on which to find that Menjivar, as leader of the STLS clique, counseled, commanded, and induced the murder of Beltran Lopez, an alleged rival gang member. See, e.g., [Dkt. No. 907] at 45-46 (testimony of Guevara Rivera that Menjivar told Arevalo to investigate Beltran Lopez as a potential "rival, enemy for us" and put him on the list of people to kill).

Next, Menjivar argues that he lacked the necessary intent to kill Beltran Lopez. [Dkt. No. 922] at 9. In a similar vein to his first argument, Menjivar maintains that "[Canales] was the leader of the clique" who sought to murder Beltran Lopez and other rival gang members, while Menjivar "was focused on making money for the clique and keeping the narcotics trade moving forward." Id. at 9-10. In support of this argument, Menjivar cites to the testimony of Guevara

---

[3] At trial, the Government introduced evidence that Menjivar, also known as Astuto, was sometimes referred to as A1 and was the leader, or "First Word," of the STLS clique.

5

Rivera who stated that Menjivar was generally calm and focused on the drug business so as to make money for the clique, whereas Guevara Rivera characterized Canales as more violent and intent on committing murders to improve the clique's positioning with MS-13 leadership in El Salvador. Id. at 10. Further, Karen Figueroa testified that during the time period leading up to the murder of Beltran Lopez, Canales was living in Virginia and was the person that members looked to as the leader of the clique, particularly because Menjivar resided in New York and visited Virginia only occasionally. Id. at 11. Menjivar maintains that this evidence underscores his argument that the Government failed to prove that he had the intent required to convict him of aiding and abetting the murder of Beltran Lopez. [Dkt. No. 922] at 9-12.

The Government responds that there was more than enough evidence showing that Menjivar intended to have Beltran Lopez and other rival gang members killed because the evidence at trial demonstrated that both Menjivar and Canales ordered low-level members of the clique to commit murders within a three-month time period so that those members could rise in rank within MS-13 and so that the clique could expand its area of control in Virginia. [Dkt. No. 930] at 4-6 (citing record evidence). This understanding was corroborated by the testimony of Guevara Rivera, who stated that he had discussed with Menjivar how he and other gang members could move into higher ranks within the gang through the commission of murders. In one exchange, Menjivar told Guevara Rivera that a list of potential murder targets already existed and all that remained was finding an opportunity to carry out the murders. Id. at 5 (citing record evidence). Guevara Rivera also testified that—after receiving approval from MS-13 leadership in El Salvador—Menjivar told members of the clique to take action against Beltran Lopez, a suspected rival gang member whose name was placed on the kill list. After Beltran Lopez was murdered, Menjivar ordered Arevalo to create a report detailing the circumstances of

5

the murders of Beltran Lopez and Jairo Mayorga ("Mayorga"). The report was prepared and sent

to Menjivar, who proceeded to edit the report through back-and-forth communications with

Guevara Rivera. Shortly thereafter, Menjivar told Guevara to burn the clothing the men had

worn during the murders, destroy the firearm they had used, and pay attention to media coverage

about the murders. Id. at 6 (citing record evidence).

Drawing all inferences in favor of the prosecution, the testimony and exhibits adduced at

trial—which were subject to extensive cross-examination—clearly demonstrate that a reasonable

finder of fact could accept the evidence as sufficient to support the conclusion that Menjivar

acted with the requisite intent to support his conviction for the murder of Beltran Lopez as an

aider and abettor.

Finally, Menjivar argues that his convictions for Counts III and IV violate the Double

Jeopardy Clause because the two VICAR offenses[4] constitute duplicative punishment premised

on the shooting of the same victim at the same moment. [Dkt. No. 922] at 13-14; United States

v. Fall, 955 F.3d 363, 373 (4th Cir. 2020) (holding that the Double Jeopardy Clause "prohibits

multiplicitous indictments for crimes that are in law and in fact the same offense" (cleaned up)).

In support of this argument, Menjivar cites to, among other cases, United States v. Wood, 14

F.4th 544 (6th Cir. 2021), wherein the United States Court of Appeals for the Sixth Circuit held

that a defendant's VICAR convictions under 18 U.S.C. § 1959(a)(3) (assault with a dangerous

weapon) and 18 U.S.C. § 1959(a)(5) (attempted murder) violated the Double Jeopardy Clause

---

[4] The Violent Crimes in Aid of Racketeering ("VICAR") statute is codified at 18 U.S.C. § 1959.
To establish that a defendant committed a violation of § 1959, the Government must prove: 1)
the existence of an enterprise; 2) that the enterprise was engaged in racketeering activity; 3) that
the defendant had a position in the enterprise; 4) that the defendant committed the violent crime
(here, conspiracy to commit murder in aid of racketeering and murder in aid of racketeering);
and 5) the defendant's purpose was to maintain and increase his position in the enterprise.
See United States v. Keene, 955 F.3d 391, 394 (4th Cir. 2020).

because "it does not appear that Congress intended for a defendant to be convicted and punished for multiple VICAR offenses based on the same shooting at the same victim at the same moment." Wood, 14 F.4th at 559-60. From that, Menjivar argues that his convictions under 18 U.S.C. § 1959(a)(5) (conspiracy to commit murder in aid of racketeering) and 18 U.S.C. § 1959(1) (murder in aid of racketeering) punish him for the "same murder of the same victim at the same instant." [Dkt. No. 922] at 15.

The Government argues that Menjivar's VICAR convictions for conspiracy to commit murder (Count III) and murder (Count IV) are "different in law and in fact" and that the United States Court of Appeals for the Fourth Circuit has "expressly recognized that there is no Double Jeopardy problem when it comes to prosecuting an individual for VICAR murder conspiracy and VICAR murder." [Dkt. No. 930] at 10 (citing United States v. Williams, 155 F.3d 418, 420 (4th Cir. 1998)). Further, the Government distinguishes Woods by explaining that the Sixth Circuit vacated Woods's conviction for attempted murder—a substantive count—because it was premised on the exact same conduct at issue in his conviction for assault—also a substantive count—namely, both convictions were a result of the shooting of victim "E.G." See Woods, 14 F.4th at 559-60; see also [Dkt. No. 930] at 12 ("Woods did not argue, and the court did not find, that Woods could not have been convicted of VICAR murder conspiracy and a substantive VICAR offense.").

On this point, Menjivar is incorrect that his convictions for conspiracy to commit the murder of Beltran Lopez in aid of racketeering activity and for the substantive offense of murdering Beltran Lopez in aid of racketeering activity violate the Double Jeopardy Clause. Accord United States v. Felix, 503 U.S. 378, 392 (1992) ("We think it best not to enmesh in such subtleties the established doctrine that a conspiracy to commit a crime is a separate offense from

7

the crime itself."). Accordingly, Menjivar's request for a judgment of acquittal will be denied.

[Dkt. No. 922].

B. Arevalo's Post-trial Motion

The jury found defendant Arevalo, also known as Serio, guilty of conspiracy to

participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count I); conspiracy

to distribute cocaine, in violation of 21 U.S.C. §§ 841(a), 846 (Count II); conspiracy to commit

the murder of Beltran Lopez in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Count

III); the murder of Beltran Lopez in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1)

(Count IV); use of a firearm during a crime of violence causing death, in violation of 18 U.S.C.

§ 924(j) (Count V); the murder of Mayorga in aid of racketeering, in violation of 18 U.S.C.

§ 1959(a)(1) (Count VI); use of a firearm during a crime of violence causing death, in violation

of 18 U.S.C. § 924(j) (Count VII); witness tampering, in violation of 18 U.S.C. § 1512 (Count

VIII); and distribution of cocaine, in violation of 21 U.S.C. § 841(a) (Count XVII). Arevalo was

acquitted of conspiracy to commit the murder of Eric Lanier Tate ("Tate") in aid of racketeering

(Count IX); the murder of Tate in aid of racketeering (Count X); and the use of a firearm during

a crime of violence causing death (Count XI). See [Dkt. No. 900].

As to Count I, Arevalo asks the Court to enter a judgment of acquittal as to special

finding three, which states as follows:

> We, the jury, having found the defendant guilty of the offense
> charged in Count One, further unanimously find that as part of that
> offense, the defendant, on or about August 29, 2019, while aiding
> and abetting others, did willfully, deliberately, maliciously, and with
> premeditation kill Eric Lanier Tate . . . .

[Dkt. No. 900] at 2. The jury checked "YES" with respect to this special finding.

In his post-trial motion, Arevalo contends that because he was acquitted of all substantive counts related to the murder of Tate—Counts IX, X, and XI—there was insufficient evidence to find that he aided and abetted the murder of Tate. [Dkt. No. 923] at 1-3. Arevalo argues that the evidence supporting his involvement in the Tate murder is far from substantial and any connection was corroborated solely by the testimony of Guevara Rivera, which Arevalo attempts to paint as not credible. See [Dkt. No. 923] at 1-3.

Arevalo also contends that special finding three is in direct conflict with his acquittal on all counts related to the death of Tate because "acquittals of conspiracy and aiding and abetting logically exclude the special finding." Id. at 4. Arevalo puts forward three theories by which the special finding is inconsistent with the jury's decision to acquit him on the related substantive counts. First, the special finding that Arevalo "while aiding and abetting others, did willfully deliberately, maliciously, and with premeditation kill Eric Lanier Tate" is logically excluded by the jury's acquittal of both aiding and abetting Tate's murder and conspiring to kill Tate. [Dkt. No. 923] at 5. Second, the jury's conclusion that Arevalo was "not guilty" of the substantive offenses naturally supersedes a "yes or no" special finding regarding Tate's death, and allowing the special finding to stand despite Arevalo's acquittal of the Tate murder would violate the Sixth Amendment because any fact increasing the range of possible punishment must be found by a jury beyond a reasonable doubt. [Dkt. No. 923] at 6 (citing United States v. Ramirez-Castillo, 748 F.3d 205 (4th Cir. 2014); Apprendi v. New Jersey, 530 U.S. 466 (2000)). Third, rejecting special finding three will not undo Arevalo's conviction on Count I for racketeering conspiracy and thus will not disturb the jury's conclusion as to liability for any substantive count. [Dkt. No. 923] at 7.

In opposition, the Government argues that there was sufficient evidence introduced at trial to support the jury's finding that Arevalo murdered Tate and that inconsistent verdicts are no basis for entering a judgment of acquittal or granting a new trial. Starting with the evidence at trial, the jury was provided with ample testimony of an accomplice, Guevara Rivera, and it is "well settled that [even] the uncorroborated testimony of an accomplice may be sufficient to sustain a conviction." United States v. Savage, 885 F.3d 212, 219 (4th Cir. 2018) (quoting United States v. Manbeck, 744 F.2d 360, 392 (4th Cir. 1984)). Guevara Rivera testified that, although he was not present at the Tate murder and had not participated in it, he provided Arevalo with a firearm that Arevalo was alleged to have used to commit the murder. [Dkt. No. 923] at 2 (citing record evidence); see also [Dkt. No. 930] at 13-14 (citing record evidence of WhatsApp messages extracted from Canales's phone that corroborated Guevara Rivera's account and reflected that Guevara Rivera agreed to coordinate with Arevalo and provide Arevalo with a firearm). Guevara Rivera also testified that after the Tate murder, Arevalo and Manilester Andrade Rivas provided Guevara Rivera with a detailed account of the murder. Viewing the record in the light most favorable to the prosecution, the Court finds that the jury was presented with substantial evidence from which it could determine that Arevalo aided and abetted the murder of Tate sufficient to answer special finding three in the affirmative.

With respect to the alleged inconsistency between the special finding and the substantive counts, the Fourth Circuit has made clear that "inconsistent verdicts should not necessarily be interpreted as a windfall to the government at the defendant's expense." United States v. Thomas, 900 F.2d 37, 40 (4th Cir. 1990). Arevalo's invitation to parse through the possibilities that the jury considered in rendering its verdict "would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake," and

10

"[c]ourts have always resisted inquiring into a jury's thought processes." United States v. Powell, 469 U.S. 57, 66-67 (1984).

Moreover, the jury's determinations as to special finding three and the separate substantive counts are not wholly irreconcilable or impossible. As the Government correctly argues, there are important elemental differences between § 1959(a) (Counts IX and X) and § 1962(d) (Count I). To convict a defendant for a racketeering charge under § 1959, the Government needed to prove that Arevalo committed a violent crime "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). The RICO predicate act in Count I does not contain that element. Thus, Arevalo can logically be convicted of a RICO predicate act but acquitted of a § 1959 charge that rests on the same underlying facts. See United States v. Bailey, 2022 WL 2444930, at *12 (6th Cir. July 5, 2022); accord United States v. Ayala, 601 F.3d 256 (4th Cir. 2010) (reasoning that an offense under § 1959 and one under § 1962 each "requires proof of at least one fact that the other does not" and that "a jury could find a defendant guilty of one offense without necessarily finding him guilty of the other and vice-versa"). For these reasons, the Court will not disturb the jury's decision with respect to special finding three of Count I.

Next, Arevalo asks the Court to set aside his convictions on Counts I, III, IV, V, VI, VII, and VIII[5] because each of these convictions and related special findings in Count I are not supported by substantial evidence. [Dkt. No. 923] at 15-16. Specifically, Arevalo contends that no forensic evidence was presented at trial connecting him to the murders of Beltran Lopez or Mayorga—this includes a lack of fingerprints, DNA, firearms, and cell site location information or messages linking Arevalo to the scene of the double homicide. According to Arevalo, the lack

---

[5] These counts result from the murders of Beltran Lopez and Mayorga.

of forensic evidence—coupled with Arevalo's trial theory that Guevara Rivera committed the double homicide with Abner Molina Rodriguez—bolsters his argument that the evidence of his guilt for the double homicide counts is far from "substantial." Id. at 17.

In its opposition, the Government points to key pieces of evidence linking Arevalo to the murders of Beltran Lopez and Mayorga. For example, the jury received testimony from Guevara Rivera implicating Arevalo in the double homicide, phone records revealing that Arevalo attempted to communicate with Beltran Lopez via multiple telephone numbers in the weeks leading up to his murder, WhatsApp messages between Arevalo and Guevara Rivera discussing finding a "hen" and the need to find a vehicle in which to do so, and a report authored by Guevara Rivera after the double homicide which was sent to Arevalo indicating that Guevara Rivera, Arevalo, and Turcios "processed" two rival gang members. [Dkt. No. 930] at 18-21 (citing record evidence). There were no messages or other evidence in the record indicating that Arevalo disputed the accuracy of that report. As stated previously, there was more than sufficient evidence admitted at trial to support the jury's verdicts; accordingly, Arevalo's post-trial motion will be denied. [Dkt. No. 923].[6]

C. Turcios's Post-trial Motion

The jury found defendant Turcios, also known as Oculto, guilty of conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count I); conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a), 846 (Count II); conspiracy to commit the murder of Beltran Lopez in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Count III); the murder of Beltran Lopez in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1)

_____

[6] The arguments in Arevalo's request for a new trial, [Dkt. No. 924], will be addressed in Section II.D, infra.

(Count IV); use of a firearm during a crime of violence causing death, in violation of 18 U.S.C. § 924(j) (Count V); the murder of Mayorga in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count VI); use of a firearm during a crime of violence causing death, in violation of 18 U.S.C. § 924(j) (Count VII); and witness tampering, in violation of 18 U.S.C. § 1512 (Count VIII). See [Dkt. No. 901].

Turcios asks the Court to enter a judgment of acquittal on Count II, conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a), 846, "because there was insufficient evidence of [] Turcios's involvement." [Dkt. No. 925] at 2. As examples, Turcios contends that the Government failed to introduce any controlled buys with Turcios or at which Turcios was present, and failed to adduce evidence that Turcios actively sold cocaine for the clique. Instead, Turcios characterizes the evidence as showing only that the clique sold cocaine and that Turcios was a member of the clique. [Dkt. No. 925] at 28-29.

To prove Turcios guilty of Count II beyond a reasonable doubt, the Government was required to show: 1) an agreement to distribute cocaine existed between two or more persons; 2) Turcios knew of the conspiracy; and 3) Turcios knowingly and voluntarily became part of the conspiracy. See United States v. Howard, 773 F.3d 519, 525 (4th Cir. 2014); United States v. Ellis, 121 F.3d 908, 922 (4th Cir. 1997) (holding that the agreement may be shown by circumstantial evidence, including evidence of the existence of a "tacit or mutual understanding" between the defendant and his co-conspirators).

The Government argues that the evidence adduced at trial established that the STLS clique fueled its criminal activities through the illicit proceeds of regular cocaine sales that began as early as 2015. [Dkt. No. 930] at 27 (citing record evidence). The jury also received evidence that the clique members used WhatsApp and Facebook messages to discuss transporting and

selling cocaine and collecting money from members for clique purchases. One such conversation involved Arevalo stating: "I had coke for Carlos and had sold it to him." Although the parties presented different theories to the jury as to whether the "Carlos" referenced was Turcios or Canales, who sometimes used that nickname, the jury resolved that open question after considering the totality of the evidence when it found Turcios guilty of Count II.

Put differently, the jury was presented with evidence that Turcios associated himself with the clique for an extended period of time, and during that time, the clique was engaged in the regular sale of cocaine. Turcios attended regular clique meetings at which the gang's cocaine operation was discussed. During that same period, Turcios paid dues to the clique, with the understanding that the money was used to fund the gang's operations, which included selling cocaine. Moreover, his gang moniker appeared in the clique's financial ledgers next to notations of currency, and the jury was presented with evidence of the clique's detailed recordkeeping activities regarding the sale and distribution of cocaine by each member. Viewing the evidence in the light most favorable to the prosecution, the jury had substantial evidence on which to find Turcios guilty of conspiracy to distribute cocaine. For this reason, Turcios's post-trial motion will be denied. [Dkt. No. 925].

D. Overlapping Issues in Defendants' Post-trial Motions

All three defendants have also requested a new trial resulting from the highly improper closing argument of Turcios's counsel, as well as the Court's decision to strike that counsel's closing argument and provide a curative instruction to the jury. See [Dkt. No. 922] at 18-19; [Dkt. No. 924] 2-25; [Dkt. No. 925] 12-25.

To summarize briefly, at the conclusion of Turcios's closing argument, Arevalo's counsel requested to approach the bench and proceeded to lodge a vehement objection to what she has

subsequently described as a "perfect storm of constitutional violations" unleashed by Turcios's counsel. Specifically, Arevalo's counsel argued that Turcios's counsel, in her closing argument, revealed a mutually antagonistic defense in the final moment of trial which was not previewed to the other defendants; improperly vouched for and bolstered the testimony of Karen Figueroa, a witness who most supported the antagonistic defense; introduced facts not in evidence; and improperly commented on Turcios's decision not to testify, and by implication, Arevalo's and Menjivar's decisions as well. After excusing the jury, the Court explained that it agreed with Arevalo's counsel to the extent that Turcios's counsel improperly vouched for a witness and exceeded the bounds of an appropriate closing argument for federal court. The Court then heard argument from Menjivar's counsel, the Government, and finally from Turcios's counsel, before deciding to strike Turcios's counsel's closing argument and issue a cautionary instruction to the jury. After reviewing the case law on mutually antagonistic defenses and facing the prospect of declaring a mistrial for a trial that had consumed significant resources, the Court determined that a strongly-worded and carefully-tailored curative instruction would adequately protect the interests of all three defendants.

In their post-trial motions, Arevalo and Menjivar have asked for a new trial due to purported prejudice from Turcios's counsel's closing argument, while Turcios has asked for a new trial so as to have the constitutionally-guaranteed effective assistance of counsel in presenting a closing argument. The Government opposes the requests. [Dkt. No. 931] at 11-20.

The trial transcripts and the arguments set forth by counsel support the conclusion that the closing argument by Turcios's counsel was improper, for among other things, improperly vouching for a witness and alluding to facts not in evidence;[7] however, the Court finds that the

---

[7] See [Dkt. No. 911] at 162-176 (explaining reasons on the record).

jury instructions adequately addressed any prejudicial effect the closing argument had on the jury's consideration of the evidence against Arevalo and Menjivar. Moreover, the curative instruction the Court issued did not violate Turcios's constitutional right to effective assistance of counsel or the right to present a defense, as it expressly provided that "nothing in this instruction changes the requirement that you cannot find Mr. Turcios Villatoro guilty of any offense unless the government has proven his guilt for that offense beyond a reasonable doubt." [Dkt. No. 911] at 173. The cases cited by Turcios in his post-trial motion regarding complete deprivations of closing arguments are inapposite to what happened at this trial. The overwhelming evidence introduced at trial—coupled with the comprehensiveness of the Court's instructions to the jury—support the verdicts returned by the jury and the interests of justice do not require a new trial. See United States v. Perry, 335 F.3d 316, 322 (4th Cir. 2003)); see also Fed. R. Crim. P. 33.

Finally, all three defendants have asked the Court to grant them new trials with respect to their convictions under § 924(j) for using a firearm during a crime of violence causing death, arguing that the jury was not properly instructed as to the appropriate standard for aiding and abetting liability under the Supreme Court's decision in Rosemond v. United States, 572 U.S. 65 (2014). See [Dkt. No. 922] at 16-18; [Dkt. No. 923] at 8-11; [Dkt. No. 924] at 25-29; [Dkt. No. 925] at 29-30.

The Court will deny the motions with respect to the Rosemond argument because the Government has indicated that it intends to dismiss Counts V and VII—the § 924(j) convictions for each of the three defendants—at sentencing pursuant to Fed. R. Crim. P. 48(a) in an abundance of caution so as to avoid potential double-jeopardy concerns. See [Dkt. No. 995]; see

also <u>Lora v. United States</u>, 599 U.S. 453 (2023).  The Government should promptly file the

appropriate motions to dismiss these counts in advance of sentencing.

III.

For these reasons, defendants' post-trial motions will be denied by an Order to be issued

with this Memorandum Opinion.

Entered this 8ᵗʰ day of May, 2024.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge